**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| Torrey Terrial Townsend | : | |
| | : | |
| Plaintiff, | : | No. 3:18-cv-1684(VLB) |
| | : | |
| v. | : | |
| | : | October 14, 2021 |
| First Student | : | |
| | : | |
| Defendant. | : | |
| | : | |

## MEMORANDUM OF DECISION GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 86]

This is primarily an employment discrimination case brought by Torrey Townsend ("Plaintiff"), against her former employer, First Student ("Defendant"). [Am. Compl., Dkt. 42].  Plaintiff generally alleges that Defendant discriminated against her on the basis of her race by (1) denying Plaintiff's request for air brake training, (2) denying her request for a morning-only schedule, and (3) ultimately terminating her.  [*Id.*].

Before the Court is Defendant's motion for summary judgment as to all claims.  [Mot., Dkt. 86; Memo of Law, Dkt. 87].  Defendant argues that Plaintiff's claim under Connecticut General Statutes § 31-51m fails because it was raised outside the statute of limitations or, alternatively, fails on its merits.  [*Id.*].  Plaintiff responded and conceded that summary  judgment should enter on the § 31-51m because it was brought outside the statute of limitations.  [Opp., Dkt. 94].

1

Defendant argues that Plaintiff's race discrimination claims fail due to an absence of evidence to establish a prima facie case.  [*Id.*].  Plaintiff opposes summary judgment on the discrimination claims, arguing she established a prima facie case of race discrimination.  [*Id.*]

For the following reasons, the Court GRANTS Defendant's motion for summary judgment on all counts.

## I.    LEGAL STANDARD

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007).  "Material facts are those which 'might affect the outcome of the suit under the governing law,' and a dispute is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Coppola*, 499 F. 3d at 148 (citing to *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) ("*Liberty Lobby*").  But "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Wang v. Hearst Corp.*, 877 F.3d 69, 76 (2d Cir. 2017) (citing to *Liberty Lobby*, 477 U.S. 248)).  Whether a fact is material is determined by the substantive law.  *Liberty Lobby*, 477 U.S. at 248.

On a motion for summary judgment, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by

a finder of fact because they may reasonably be resolved in favor of either party." *Green v. Town of E. Haven*, 952 F.3d 394, 405–06 (2d Cir. 2020) (citing to *Liberty Lobby*, 477 U.S. at 250). "Thus, in ruling on a motion for summary judgment, 'the district court is required to resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" *Id.* (citing to *Kessler v. Westchester County Department of Social Services*, 461 F.3d 199, 206 (2d Cir. 2006)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact . . . ." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "[W]here the nonmoving party will bear the burden of proof on an issue at trial, the moving party may satisfy its burden by 'point[ing] to an absence of evidence to support an essential element of the nonmoving partys' case." *Id.* (citation omitted). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* (citing to *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

> A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.

*Welch–Rubin v. Sandals Corp.*, No. 3:03-cv- 481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, 817 F. Supp. 2d 28, 37 (D. Conn 2011). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient;

there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of New York*, 352 F.3d 733, 743 (2d Cir. 2003) (citing to *Liberty Lobby*, 477 U.S. at 252)).    Where there is no more than a scintilla of evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712, 727 (2d Cir. 2010).

A party's own affidavit may be enough to fend off summary judgment if it is based on personal knowledge and is consistent with prior pleadings and testimony. *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 53 (2d Cir. 1998) (reversing district court grant of summary judgment because district court did not give party's affidavit weight and affidavit was consistent with prior pleadings and testimony); *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (same). However, if the affidavit is inconsistent with prior deposition testimony or pleadings, it does not create "a genuine issue for trial."  *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *see Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir.2011) ("in certain extraordinary cases, where the facts alleged are so contradictory that doubt is cast upon their plausibility, the court may pierce the veil of the complaint's factual allegations and dismiss the claim.").

Local Rule 56(a) outlines the local requirements for filing and responding to a motion for summary judgment, including the Local Rule 56(a) statement

requirements.  Local Rule 56(a)1 requires the party moving for summary judgment to file and serve a memorandum entitled "Local Rule 56(a)1 Statement of Undisputed Material Facts."  This memorandum is required to "set forth, in separately number paragraphs . . . a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried."  Loc. R. 56(a)1.  When responding to the motion for summary judgment, the nonmoving party is to provide a Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment, "which shall include a reproduction of each numbered paragraph in the moving party's Local Rule 56(a)1 Statement followed by a response to each paragraph admitting or denying the fact and/or objecting to the fact as permitted under Federal Rule of Civil Procedure 56(c)."  Loc. R. 56(a)2. Local Rule 56(a)3 provides that each statement of material fact must be followed by a specific citation.  The failure to provide specific citations may result in the court deeming a fact admitted, or imposing sanctions: "including, when the movant fails to comply, an order denying the motion for summary judgment, and when the opponent fails to comply, an order granting the motion if the motion and supporting materials show that the movant is entitled to judgment as a matter of law."  Loc. R. 56(a)3.

Rule 56 of the Federal Rules of Civil Procedure require "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by (A) citing to particular parts of materials in the record . . .; or (B) *showing* that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. Pro. 56(c) (emphasis added).  In reviewing a motion for summary judgment, "[t]he court need consider only cited materials, but it may consider other materials in the record."  Rule 56(c)(3). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order."  Rule 56(e).

## II.    BACKGROUND

Plaintiff is an African American woman.  [Am. Compl. at p.1].  Plaintiff was employed by Defendant as a school bus driver from September 24, 2012 until her termination on November 17, 2017. [Pl.'s 56(a)(2) Statement, Dkt. 95 at ¶ 1].  Plaintiff claims she made various complaints to Defendant and its agent, Paul DeMaio— Senior Location Manager for Defendant—throughout her employment; including requesting air brake training, requesting a part-time morning-only schedule change, alleging Defendant failed to properly maintain Driver's Vehicle Inspection Reports ("DVIR") on their buses, and Defendant's alleged improper use of ZONAR. [*Id.* at ¶ 2].  The Court addresses the facts relating to each of these claims below.

### A.  Airbrake Training

The first complaint relates to Plaintiff's request for air brake training from Defendant, with the goal of taking and passing an air brake training test, which will

result in an endorsement.[1]  Plaintiff sought air brake training prior to her Commercial Driver's License ("CDL") proficiency exam in March 2017, but she was denied that request.  [Def.'s Ex. C at PDF p. 29].  A driver is only able to take the air brake training test to obtain the endorsement when his/her Commercial Driver's License ("CDL") proficiency needs to be renewed.  [Pl.'s 56(a)2 Statement at ¶ 4].[2]  Thereafter, Plaintiff sent a letter to Mr. DeMaio dated August 4, 2017, seeking air brake training.  [*Id.* at ¶ 3].  In her letter, Plaintiff indicates that she made a similar request in 2015, which was denied by a prior supervisor.  [Def.'s Ex. B].  In addition, she states "[t]he denial of the Airbrake endorsement, disabled my opportunities to move forward.  Your company is displaying favoritism and racial imbalances throughout the five years I have been employed for First Student.  Please note I am asking for fear [(sic)] opportunities just the way your company give to the Hispanics employees." [*Id.*].  Plaintiff admits that the reason she wanted the air brake endorsement was because it would have created more economic opportunities for her outside of her employment with Defendant.  [Pl.'s 56(a)2 at ¶ 5].

---

[1] **According to the Connecticut Department of Motor Vehicle website, a holder of a Commercial Drivers License ("CDL") can request to have additional endorsement added to their license if the past a test.  Available at: https://portal.ct.gov/DMV/Licenses/Licenses/Commercial-Drivers/Commercial-Learner-Permit.  As explained, one such endorsement is an air brake endorsement.  *Id.*  This is not a fact stipulated to by the parties, rather it is intended to convey some context for those unfamiliar with CDL endorsement programs.**

[2] **Plaintiff's purported "objection" to this fact does not dispute the validity of this fact, but adds additional allegations that will be discussed elsewhere, and thus, the fact is deemed admitted.**

Subsequent to her written request, Plaintiff was granted permission to take the air brake test on March 22, 2019, which is when she could take her next proficiency test.  [*Id.* at ¶ 6].

During her deposition, when Plaintiff was asked why she believed the denial of her initial request for air brake training was based on her race, Plaintiff asserted that Hispanic employees were afforded the opportunity to obtain air brake training. [*Id.* at ¶ 31].[3]  During her deposition, the following exchange took place:

> Q. So, did you believe that Hispanic employees were given the opportunity to take air brake endorsements and you were not?
>
> A. I do. And how I know is that is because most of the trainers-no, all of the trainers are Hispanic when I was there. The only people that had air brake training endorsements were the trainers, and all of the trainers moved on and got hired for Connecticut Transit.

[*Id.*].  Plaintiff admitted she was not a trainer.  [*Id.*].  She then stated she knew only of one Hispanic driver who held the air brake endorsement, but she could not recall his name.  [*Id.*]. She indicated that this other driver was a Class A truck driver. [Def.'s Ex. C at PDF p. 32].

In addition, Plaintiff states that she believed the denial of her request to take the air brake training was based on her race because "[Mr. DeMaio's] rationale was, if he allowed his employees to have air brake training or a lot of them or all of them to have air brake training, he is going to lose employees."  [Pl.'s 56(a)2 at ¶ 32].

---

[3] Plaintiff's "objection" to this paragraph of the 56(a)1 statement does not comply with Rule 56(c) and is deemed admitted.

B. <u>**Morning-Only Schedule**</u>

The second complaint Plaintiff made throughout her work experience with Defendant related to a request for a schedule change.  Plaintiff sent a letter dated August 4, 2017 to Mr. DeMaio asking to have a morning-only schedule.  [*Id.* at ¶ 7]. Plaintiff explained she made this request because:

> I wanted to pursue, I wanted to work for First Student part-time and work for somebody else on- I didn't want to leave them completely. I just wanted to do the morning shift and work for another company to make more money.

[*Id.* at ¶ 8].  Mr. DeMaio denied the request.  [*Id.* at ¶ 9].  Mr. DeMaio explained the reason he denied her request was because he sought to put an end to morning/afternoon-only schedules because children needed to both be picked up in the morning and dropped off in the afternoon.  [*Id.*].  In other words, accommodating an employee who had a morning/afternoon-only scheduled was logistically complicated considering the need to cover the shift the employee does not take.  Mr. DeMaio testified he began denying all morning/afternoon-only requests shortly after he began working as a supervisor for this reason.  [*Id.*]. Plaintiff agrees that this is the explanation Mr. DeMaio gave her when he denied her request in August 2017.  [*Id.* at ¶ 37].

Plaintiff was asked during her deposition why she believed Mr. DeMaio's denial of her request for a morning-only scheduled was based on her race.  [*Id.*at ¶ 34].  She testified:

> A. I think that personally for me, I felt like a lot of it was due to my race and I think a lot of it was due to because I was on where I am on, you know, federal assistance and I think that they wanted to keep me at a certain income guidelines.

> Q. Why do you think it was based upon your race?
>
> A. I feel they are very flexible in giving to Hispanic workers. I think they are very hard on the black minority.

[*Id.*].  When asked whether she could name any of the Hispanic people she believed were given the request, she said: "They all have the same name, Rodriguez, Jose, Angel Gonzalez, I don't know."  [*Id.* at ¶ 35].  She was unable to directly identify a comparator who received a morning/afternoon-only schedule, whether Hispanic or otherwise.  [*Id.*].

Thereafter, she wrote to her Union representative.  [*Id.* at ¶ 36].  In her letter, she stated that the reason she thought her request for a morning-only scheduled was denied was because Defendant was retaliating against her for a suit she brought against the City of New Haven and the State of Connecticut.  [*Id.* at ¶ 36].  No additional facts were presented relating to the litigation mentioned in Plaintiff's letter.

## C.  DVIR and ZONAR

The third complaint Plaintiff made throughout her work experience with Defendant related to her objections with Defendant's use of a digital record keeping program called ZONAR.  Plaintiff alleged in her complaint that she made several complaints to Mr. DeMaio that Defendant was not complying with Federal and Connecticut law when it came to maintaining DVIRs.[4]  [*Id.* at ¶ 10].  Defendant uses

---

[4] **Connecticut State Agencies section 14-275c-41 provides for the regulations of DVIRS and states in part:**
   **(a) Every carrier shall require its driver or each of its drivers, whichever is applicable, to prepare and submit to the carrier a written report, on a daily basis, with respect to each school bus or STV operated by said driver or drivers. The report shall identify the vehicle**

a program called ZONAR, which is an electronic system through which vehicle inspections are conducted by Defendant's drivers. [*Id.* at ¶ 12].  Plaintiff believed—and shared this belief with Mr. DeMaio—that using ZONAR instead of a written DVIR violated the law.  [*Id.* at ¶ 11].  Mr. DeMaio did not agree with Plaintiff's assessment and insisted that ZONAR was proper and in compliance with the legal and regulatory schemes.  [*Id.*].

### D.  Termination

Plaintiff was ultimately terminated following events that unfolded on October 25, 2017.  On that date, Defendant was relayed a complaint that one of Defendant's drivers was late to arrive to school, was aggressively honking the horn outside the school, and was very rude to one of the security guards.  [Pl.'s 56(a)2 ¶ 15].[5] Defendant concluded the complained-of driver was Plaintiff and then had videotape footage from Plaintiff's bus pulled for investigation.  [*Id.*].

---

and list any defects or deficiencies discovered during each driver's pre-trip and post-trip inspections or otherwise known to the driver which could affect safety of operation, safety of passengers, or result in a mechanical failure or breakdown. Before driving a vehicle, the driver shall be satisfied that the vehicle is in safe operating condition. If no such defects or deficiencies are discovered or become known, the report shall so state. The report shall be signed and dated by the driver, attesting to its completion and accuracy, and shall be signed by the carrier, through its authorized agent or employee, in acknowledgment of its receipt.

[5] The Court grants Plaintiff's objection to paragraph 15 of Defendants 56(a)1 Statement, which objects to the allegation that a person named Teddy Barros made the call relaying the message about the complaint from Sheridan School.  Plaintiff's objection is only limited to finding the specific person who made the call.  Plaintiff does not object to the other substantive information contained in this statement. Thus paragraph 15 is deemed admitted aside from the name of the alleged caller.

Defendant's employee, Assistant Manager Vasil Chicau, drafted an email where he indicated that he reviewed the videotape from Plaintiff's bus of October 25, 2017.  [*Id.* at ¶ 16].[6]  Mr. DeMaio did not personally review the video.  [Pl.'s Ex. 2 at PDF p. 88].  Chicau indicates in the email that the video reveals that the driver failed to complete a pre-trip inspection of the bus before departing.[7]  [Def.'s Ex. F]. He indicates that the driver put the bus in reverse and backed the bus without beeping the horn first.  [*Id.*].  At 6:57AM the driver called base stating that someone intentionally poured water on the driver's seat and in other parts of the bus.  [*Id.*]. At 7:11AM the driver called base to say she was going home to change her pants that got wet from the seat.[8]  [*Id.*].  She then exits the bus at a police station, leaves the keys in the ignition and fails to conduct a child check before leaving.[9]  [*Id.*].

---

[6] **Plaintiff objects to the admission of this fact and additional facts relating to the videotape evidence arguing that such statements are inadmissible because the tape was not produced in discovery.  Plaintiff has cited to no case law, rule of evidence, or any authority whatsoever to justify its position that this evidence is inadmissible.  Defendant's response argues that this evidence is admissible because it is not being offered for the truth of the matter asserted, but rather as evidence of the investigation of the incident and to put context to Mr. DeMaio's conduct thereafter.  The Court finds that Plaintiff abandoned its objection by failing to cite to any authority or legal argument to supports is vague claim that the evidence is inadmissible.**

[7] **Defendant's employee handbook provides that "Drivers are responsible for ensuring that the vehicle is safe to operate by conducting the proper pre-trip inspection as required by the law and regulations and the Company . . . ."  [Pl.'s 56(a)2 at ¶ 43].**

[8] **Defendant's employee handbook prohibits "deviation from assigned routes unless approved by management and/or district."  [Pl.'s 56(a)2 at ¶ 42].**

[9] **Defendant's employee handbook provides the following regarding the necessity of completing the child check procedure:**

> **It is the responsibility of each driver to follow without exception the company requirements for performing the sleeping child/passenger protection procedures . . .  All First Student employees who transport passengers or move our vehicles including, but not limited to, drivers, monitors and technicians are accountable for performing this critical**

Three minutes later a "child check alarm" went off, the driver returned to the bus to reset the key, did not conduct a child check, and then exited the bus again while the keys were still in the ignition.  [*Id.*].  Another three minutes go by and another "child check alarm" goes off, at which point she does do a child check and removes the keys from the ignition.  [*Id.*].  At 7:18AM, a police officer enters the bus where the driver shows the wet seat.  [*Id.*].  Four minutes later she leaves the police and proceeds home.  [*Id.*].

The email goes on to describe the drop-off event.  The email states that at 9:38AM the driver arrives at a school.  [*Id.*].  Four minutes later she blows the horn for school officials to get the students.  [*Id.*].  Two minutes later she calls base to state that no one is coming out to the bus.  [*Id.*]  She continued to blow the horn until 9:48AM.  [*Id.*].

During Plaintiff's deposition, she presented her own side of the story, where she said she did do a pre-trip inspection that day and that she told Mr. DeMaio of such.  [Pl.'s Ex. 1 at PDF p. 41–42].  She also rebutted the claim that she went to the police station, claiming that the police officer was in her parking lot at home.  [Pl.'s Ex. 1 at PDF p. 33].  Plaintiff admitted to blowing the bus horn "two to three times."  [Pl.'s Ex. 1 at PDF p. 45].  She explained that she didn't think this was wrongful conduct because she called base, and someone there told her to keep blowing her horn.  [Pl.'s Ex. 1 at PDF p. 45].  Plaintiff did not directly respond to the allegations that she twice failed to remove the keys from the ignition and  failed to

---

safety inspection.  Any employee operating a First Student vehicle is required to conduct a through search of the vehicle prior to [exiting].  [Pl.'s 56(a)2 at ¶ 44].

conduct a child safety check before exiting the vehicle. Plaintiff also did not directly respond to the allegations that she backed the vehicle up without honking her horn.

Plaintiff met with Mr. DeMaio the next day. [Pl.'s 56(a)2 at ¶ 19]. The parties disagree about whether Plaintiff was given an opportunity to explain her side of the story. Plaintiff states she was not given a chance to say her side of the story. As the non-moving party, the Court accepts as true Plaintiff's claim that she was not given a chance to say her side of the story. Plaintiff was placed on paid administrative leave after that meeting. [Pl.'s 56(a)2 at ¶ 22].

Following being placed on administrative leave, Defendant claims its representatives tried to call Plaintiff, but she denies receiving any calls. [Pl.'s 56(a)2 at ¶ 23]. Plaintiff did not call Defendant to inquire as to the status of her investigation. [*Id.*]. On November 17, 2017, Mr. DeMaio sent a letter to Plaintiff informing her that her employment was being terminated based upon the following "serious violations" of Defendant's policy discovered after viewing the videotape from Plaintiff's bus on October 25, 2017: intentionally failing to perform a pre-trip inspection; leaving a vehicle unattended with the key in the ignition and running; not performing a child check; unsafe backing and operation of the bus; and unauthorized stop. [*Id.* at ¶ 24].

Plaintiff's union grieved her termination, but subsequently withdrew the grievance after determining that there was no merit to Plaintiff's claim. [*Id.* at ¶ 26].

Plaintiff filed a Connecticut Commission on Human Rights and Opportunities ("CHRO") charge on December 23, 2017 naming Defendant as the respondent. [*Id.*

at ¶ 27]. On May 9, 2018, the CHRO issued a Release of Jurisdiction from the CHRO from this charge. [*Id.* at ¶ 28]. The Equal Employment Opportunity Commission ("EEOC") issued a notice of Right to Sue on June 6, 2018. [*Id.*].

Plaintiff filed a second CHRO charge on September 28, 2018. [*Id.* at ¶ 29]. On March 6, 2019, the CHRO issued a release of jurisdiction for this charge, stating, "These are the same allegations contained in [the first CHRO case], for which Complainant requested and received a release of jurisdiction on May 9, 2018. Complainant cannot file the same complaint against the same Respondent twice." [*Id.*]. The EEOC issued a notice of Right to Sue on May 9, 2019. [*Id.* at ¶ 30].

During Plaintiff's deposition, Defendant's counsel inquired as to why she believed her race played a role in her termination. Plaintiff suggested that the horn beeping allegations were "conjured up with the Hispanics" by Mr. DeMaio, who was angered by Plaintiff for calling the police. [Pl.'s Ex. 1 at PDF p. 44]. When asked to elaborate further, she explains "That means that at the board of education, there is nothing but Hispanic women that work in the board of education transportation . . . ." [Pl.'s Ex. 1 at PDF p.45]. Plaintiff was asked why she believed her termination was based on race, she said:

> The reason why I think that the termination was based on my race is because of the way First Student is – well, when I was there, I can only speak from when I was there, the way they hired, the board of education transportation department was predominantly Hispanic, actually it was all Hispanic that worked in that particular office. . . . Now, the problem that I'm having where I'm feeling discriminated at all is because if it was a fair investigation . . . He targeted me, and I think he targeted me based on my race and based on retaliation of the police report.

[Pl.'s Ex. 1 at PDF p. 52–54].

No other evidence relating to racial motivation was provided aside from Plaintiff's conclusory beliefs that she expressed during her depositions. Specifically, no comparator evidence was presented, no racial comment was cited, nor was there any evidence that a non-African American filled her position after her termination.

## III.    DISCUSSION

### A.  Connecticut General Statute § 31-51m Claim

Count Three of the Amended Complaint alleges a violation of the Connecticut Labor Relations Act, codified at Connecticut General Statutes § 31-51m.  Generally, § 31-51m prohibits employers from discharging or disciplining employees who report their employer's suspected violations of law to a public body. Section 31-51m(c) provides that employees may bring suit within ninety days of the date of the final administrative determination or within ninety days of the violation, whichever is later.

Defendant argues that Plaintiff's § 31-51m claim came well outside the ninety-day statute of limitation under subsection (c).  Plaintiff agrees and concedes judgment on this claim should be entered in favor of Defendant.  The Court accepts Plaintiff's concession, finding that Plaintiff's complaint did come well after the ninety-day limitation period.

Therefore, the Court grants judgment in favor of Defendant on Count Three of the Amended Complaint.

**B.** <u>Title VII and Section 1981 Claims</u>

The only remaining claims that have not either been dismissed or conceded are the Title VII and Section 1981 claims, wherein Plaintiff alleges that Defendant discriminated against Plaintiff on the basis of her race in (1) denying her air brake training, (2) denying her a morning-only schedule, and (3) terminating her.

**i.** *Legal Standard*

Under both Title VII and section 1981, Plaintiff's claims of discriminatory treatment are analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *White v. Eastman Kodak Co.*, 368 Fed. Appx. 200, 201 n.1 (2d Cir. 2010) (citing to *Hudson v. Int'l Bus. Machs. Corp.*, 620 F.2d 351, 354 (2d Cir. 1980)). The *McDonnell Douglas* standard requires that Plaintiff establish a *prima facie* case of discrimination by showing that (1) she is part of a protected class; (2) that she was qualified for his position; (3) that she suffered an adverse employment action; and (4) that the circumstances surrounding the employment action give rise to an inference of discrimination. *McDonnell Douglas*, 411 U.S. at 802. The Second Circuit has noted that the burden to establish a *prima facie* case is "minimal" or "*de minimis*." *Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 76 (2d Cir. 2005).

If Plaintiff can establish a *prima facie* case, the burden shifts to the Defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802. At this stage, Defendant need only proffer, not prove, the existence of a nondiscriminatory reason for its employment decision. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981).

If Defendant meets its burden of production, the burden shifts back to Plaintiff to show that the legitimate, nondiscriminatory reason offered by the Defendant is mere pretext for illegal employment discrimination. *McDonnell Douglas,* 411 U.S. at 804.

"Although the intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves,* 530 U.S. at 143.   To survive summary judgment, "[t]he plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination [or retaliation] was the real reason for the employment action."   *DeMuth v. United States Small Bus. Admin.*, 819 F. App'x 23, 25 (2d Cir. 2020), *cert. denied sub nom. DeMuth v. Small Bus. Admin.*, 141 S. Ct. 1741 (2021).

### ii.  *Air Brake Training and Morning-only Schedule*

Plaintiff alleges that she was discriminated against on the basis of her race when Defendant denied her requests for air brake training and for a morning-only scheduled. Defendants argue with respect to both requests that neither constitutes an "adverse employment action" sufficient to satisfy the third prong of a prima facie case of discrimination.  Plaintiff did not respond to Defendant's argument that the denials of these requests do not constitute "adverse employment actions."

The Court finds that Plaintiff has abandoned these claims by failing to respond to Defendant's argument as to the third element of the prima facie case.

*See Coger v. Connecticut*, 309 F. Supp. 2d 274, 280–81 (D. Conn. 2004) (finding that the failure to respond to the defendant's argument as to a claim is a basis for finding that the plaintiff abandoned the claim). *See also Carone v. Mascolo*, 573 F. Supp. 2d 575, 591 (D. Conn. 2008) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.") (citing to *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)).

Notwithstanding Plaintiff's abandonment of these claims, the Court finds that Plaintiff cannot satisfy the "adverse employment action" element based on the facts pled with respect to the requests for air brake training and morning-only schedule.  An "adverse employment action" is one which is "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (citing to *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).  "Examples of materially adverse changes include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."  *Id.*

Here, denial of Plaintiff's requests for air brake training and a morning-only schedule do not amount to a materially adverse change in her employment.  Rather, the denial maintained the status quo.  It does not even rise to a "mere inconvenient or an alteration of job responsibilities."  Nor has she established that these requests amount to some type of entitlement enjoyed by other employees of equal

position.  The evidence shows that air brake training was only afforded to trainers, which she admittedly is now.  The evidence also shows that Mr. DeMaio did not afford any employee a new morning/afternoon-only schedule, not just Plaintiff.  Even more so, her requests were completely unrelated to her role with Defendant.  She made both requests for the purpose of securing other employment.  No reasonable jury could possibly conclude that the denials of these two requests were "adverse employment actions."

Therefore, even if Plaintiff did not abandon these claims, Plaintiff has not established a genuine issue of material fact with respect to her claims of employment discrimination in denying her requests for air brake training and a morning-only scheduled because Plaintiff has failed to show that these denials are adverse employment actions.

Finally, Plaintiff has failed to allege facts suggesting these denials occurred under circumstances giving rise to an inference of discrimination.  Her claim is based solely on her subjective belief unsupported by any facts. She cites no racial epithet, no comparator and no replacement employee who was not a member of her protected class.

### iii.  *Termination*

Plaintiff alleges that she was discriminated against on the basis of her race when Defendant terminated her.  Defendant points to an absence of evidence to satisfy the fourth element of a prima facie discrimination claim, that is "that the circumstances surrounding the employment action give rise to an inference of

discrimination."   Plaintiff's opposition does not clearly address Defendant's argument, rather Plaintiff merely reiterates her general claims from her complaint.

In determining whether the plaintiff has met the *de minimis* initial burden of showing "circumstances giving rise to an inference of discrimination," the function of the court on a summary judgment motion is to determine whether the "proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. It is not the province of the summary judgment court itself to decide what inferences should be drawn." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204 (2d Cir. 1995).  In *Cronin*, the Second Circuit found the plaintiff established his *de minimis* burden to adduce evidence from which a rational inference of age discrimination could be drawn in light of the evidence that the plaintiff was a qualified employee, the defendants put the plaintiff into positions they knew he would not do well in, and the defendant gave the job the plaintiff was qualified for to those with lower performance ratings, less experience, but who were on average 23 years younger than the plaintiff.  *Id.* at 205–06.

> [A]s discrimination will seldom manifest itself overtly, courts must be alert to the fact that [e]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law. . . .. However, they must also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture. This undertaking is not one of guesswork or theorization. After all, [a]n inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact [that is known to exist].

*Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999), *as amended on denial of reh'g* (Dec. 22, 1999) (internal citations and quotation marks omitted).

Plaintiff generally claims that Defendant's use of ZONAR was used to target her for harassment.  Specifically, Plaintiff alleges that Defendant used ZONAR to change her sign-in time, making it look as if she was late for work, and then use that to fire her.  This argument fails for several reasons.  First, Plaintiff was not terminated for poor attendance.  Second, Plaintiff presents no evidence that Defendant manipulated ZONAR to alter her attendance records.

Further, there is no indication that the use of ZONAR has anything to do with her race other than Plaintiff's unsupported claim that "the people they fired . . . were a lot of black women that look like me for being late . . . ."  [Pl.'s Ex. 2 at PDF p. 37].  Plaintiff has provided no evidence whatsoever that any particular black woman, or any employee at that fact, was ever terminated for being late.  Therefore, the Court rejects Plaintiff's argument that Defendant's use of ZONAR is evidence that supports a reasonable inference of discrimination.

Plaintiff also alleges an inference of discrimination can be found based on an incident with a fellow employee back in January 2017, approximately ten months prior to her termination. By way of background, on January 31, 2017, Plaintiff filed an incident report relating to a confrontation in the driver's room with a fellow employee.  [Pl.s' 56(a)2 at ¶ 6; Def.'s Response at ¶ 6].  Another employee began yelling at Plaintiff saying "My nigga[10] you going to bump me."  [*Id.*]. Plaintiff asked

---

[10] The Court takes judicial notice of the definitions of "my nigga," which indicate that person using the term and the context in which it is used determines whether it is pejorative or familiar.  It can be used to mean "your partner through thick and thin. someone who will always help you out, no matter the situation." Urban Dictionary. https://www.urbandictionary.com/define.php?term=My%20nigga, Last visited October 14, 2021.  According to Dictionary.com: "Nigga is used mainly among African Americans, but also among other minorities and ethnicities, in a

her to leave her alone.  [*Id.*]  Plaintiff asked two managers for assistance regarding this employee, but received no help.  [*Id.*].  This employee "continued to tell [Plaintiff] and everyone else, she was going to beat [Plaintiff's] ass, punch [her] in the face."  [*Id.*]. During Mr. DeMaio's deposition, he stated he could not remember if the other employee received any discipline as a result.  [Pl.'s Ex. 2 at PDF p. 71]. He did say that "the little [he] recall[s] about it was that [Plaintiff] was – the allegation was that [Plaintiff] was the instigator, and it was a back and forth between two employees."  [*Id.*].

Plaintiff has presented no factual or legal basis connecting her termination to this incident.  While she interpreted the comment to be a racial slur, Plaintiff presents no factual or legal basis for imputing the comment made by a fellow employee upon Defendant as a basis for supporting an inference of discrimination. There is nothing in the record to suggest that Defendant's potential failure to discipline the fellow employee was at all based on Plaintiff's race.

Plaintiff has not produced any evidence that attributes the statement to Defendant, whether by adoption, attribution or otherwise.  Suggesting this incident is some evidence of racial discrimination on the part of Defendant's agents would

---

neutral or familiar way and as a friendly term of address. It is also common in rap music. However, nigga is taken to be extremely offensive when used by outsiders. Many people consider this word to be equally as offensive as nigger. The words nigger and nigga are pronounced alike in certain dialects, and so it has been claimed that they are one and the same word. noun Slang: Usually Disparaging and Offensive. a term used to refer to or address a Black person." https://www.dictionary.com/browse/nigga (last visited October 14, 2021). The lack of context provided by Plaintiff and the prevalence of the use of the term in popular rap music make it impossible on this record to decern whether the term was used pejoratively or familiarly.

be based on unfounded speculation and conjecture, which does not satisfy Plaintiff's burden of proof.

Plaintiff also raises some claims relating to a prior suspension in 2013, approximately four years prior to her termination.  Plaintiff testified that on November 16, 2013, she drove to Quinnipiac School in New Haven to pick up children and when the children entered the bus, she called Defendant's dispatch asking for a bus monitor because the kids were moving around.  [Pl.'s 56(a)2 at ¶ 12; Def.'s Responses at ¶ 12].  Dispatch told her to proceed, which she refused.  [*Id.*].  She was disciplined by being placed on administrative leave.  [*Id.*]. She was eventually removed from administrative leave and returned to work.  Similar to the allegations relating to the 2017 incident, Plaintiff here makes no legal or factual argument connecting these facts to her discrimination claim.  There is no racial connotation to this incident.  Finally, there is no logical connection between this incident and her termination. Thus, any argument that the 2013 suspension establishes an inference of discrimination fails.

Lastly, in her opposition, Plaintiff presents her narrative of the events leading up to her termination.  She argues that she was not given an opportunity to defend herself, that the investigation conducted by Defendant was faulty, and she was denied due process.  However, this is not a due process case, nor a retaliation case.  This is a race discrimination case.  Plaintiff does not argue or even suggest any where in her briefing that the termination process is evidence from which an inference of racial discrimination could be drawn.  There is nothing connecting her race to her allegations of unfair treatment.  She identifies no

comparator who was afforded the opportunities she says she was denied. No rational jury, reading the evidence most favorably to Plaintiff, could infer racial discrimination based on the facts alleged.

Therefore, Plaintiff's discrimination claims must fail because she has not presented any evidence to satisfy the fourth prong of a prima facie racial discrimination case.

IV.     **CONCLUSION**

For the above reasons, the Court grants summary judgment in favor of Defendant on all remaining claims.  The Clerk is directed to enter judgment in favor of Defendant and close the case.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated this day in Hartford, Connecticut: October 14, 2021